**UNITED STATES of America**

**v.**

**MASSACHUSETTS WATER RESOURCES AUTHORITY, and Metropolitan District Commission**

**Civil Action No. 98–10267–RGS.**

United States District Court,
D. Massachusetts.

May 3, 1999.

George B. Henderson, United States Attorney's Office, Boston, MA, for plaintiff.

John M. Stevens, Jonathan M. Ettinger, Monica E. Conyngham, Foley, Hoag & Eliot, Boston, MA, for defendant Massachusetts Water Resources Authority.

Edward J. DeAngelo, Douglas Wilkins, Attorney General's Office, Boston, MA, for defendant Dept. of Metropolitan District Commission.

Alexandra Dawson, Hadley, MA, for defendants Nashua River Watershed Assoc., Massachusetts Audubon Society, Friends of Quabbin, Inc., Water Supply Citizens Advisory Committee.

## MEMORANDUM AND ORDER ON UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

STEARNS, District Judge.

On February 12, 1998, the United States, on behalf of the United States Environmental Protection Agency ("EPA"), brought this enforcement action against the Massachusetts Water Resources Authority ("MWRA") and the Metropolitan District Commission ("MDC")[1], alleging continuing violations of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f, et seq., and the EPA's Surface Water Treatment Rule ("SWTR"), 40 C.F.R. Part 141. The United States seeks injunctive relief in the form of an order requiring the MWRA to construct a filtration plant to treat water that it sources from the Wachusett Reservoir to supply customers in the metropolitan Boston area.

The MWRA initially maintained that because the Massachusetts Department of Environmental Protection ("DEP"), the primary agency responsible for enforcement of the SWTR regulations, had determined that it was in compliance with the SWTR's avoidance criteria, it could not be compelled by the EPA to filter its water. The MWRA would prefer to treat its water with an ozonation method which, with other improvements in its system, the MWRA regards as a superior substitute for filtration. The MWRA concedes that subsequent to the DEP's determination (and the filing of its brief), it fell out of compliance with the avoidance criteria. From the government's perspective, whether the MWRA was out of compliance with the criteria on December 30, 1991 (the date mandated by the SWTR), or after November 13, 1998 (the date of the DEP's determination), is immaterial because the SWTR admits of only one remedy, filtration. The MWRA takes the position that because the SDWA, 42 U.S.C. § 300g–3(b), authorizes a district court to enforce compliance with the SWTR by entering "such judgment as protection of public health may require," the court's

---

1. The United States has named the MDC as a party because of its control of the Wachusett Reservoir and watershed. The United States maintains that the MDC is a necessary party within the meaning of Fed.R.Civ.P. 19 because without it "complete relief cannot be accorded." The Complaint does not allege that the MDC is in violation of any federal or state statute or regulation. Although the MDC was a (largely) passive participant in many of the events leading to this lawsuit, I have generally referenced only the MWRA as it is the acknowledged target of the EPA's enforcement action.

power to fashion an equitable remedy for an SWTR violation is broader than the scope of the EPA's enforcement powers, and is therefore not limited to ordering filtration.

## REGULATORY BACKGROUND

The SDWA, passed by Congress in 1974, charges the EPA with overall responsibility for protecting the nation's public water supply. Congress directed the EPA to promulgate maximum contaminant levels (MCLs) for waterborne pathogens, or, if that was not feasible for economic or technological reasons, to mandate treatment methods. 42 U.S.C. §§ 300f(1)(C); 300g–1(a); 300g–1(7)(A). A 1986 amendment to the SDWA reflected Congress's judgment that filtration was the superior extant technology for removing bacterial and viral contaminants from water. See 42 U.S.C. § 300(g)–1(b)(7)(C)(i) (directing the EPA to specify criteria under which filtration is required as a treatment technique).[2] On June 29, 1989, the EPA promulgated drinking water regulations, collectively referred to as the Surface Water Treatment Rule (SWTR), which apply to all public water systems using surface water or ground water sources influenced by surface water. See 40 C.F.R. § 141.70 et seq. The EPA concluded that it was not feasible to establish MCLs for *Giardia lamblia*, viruses, heterotrophic plate count bacteria, and Legionella, the principal contaminants affect-ing municipal water supplies. Consequently, the SWTR mandates filtration treatment techniques, where required, to achieve:

(1) at least 99.9 percent (3–log) removal and/or inactivation of *Giardia lamblia* cysts between a point where the raw water is not subject to recontamination by surface water runoff and a point downstream before or at the first customer; and

(2) at least 99.99 percent (4–log) removal and/or inactivation of viruses between a point where the raw water is not subject to recontamination by surface water runoff and a point downstream before or at the first customer.

40 C.F.R. § 141.70(a).

The SWTR was intended to be "self-implementing" in the sense that it required non-compliant water systems to install treatment facilities by June 29, 1993, unless by December 30, 1991, a water system could demonstrate that it met the avoidance criteria set out at 40 C.F.R. § 141.71(a) and (b). Public water systems that met the avoidance criteria but later fell out of compliance were given eighteen months from the date of noncompliance to begin filtration. *Id.* § 141.73. The SWTR makes no provision for reopening a filtration determination once made. Although the deadlines imposed by the SWTR are couched in categorical terms,[3] an internal

2. The Senate Report accompanying the amendment stated:

> The problem of viral and bacterial contamination of drinking water is addressed in the [SDWA] by the requirement that EPA issue criteria specifying those systems which must filter their surface water supplies and promulgate regulations requiring disinfection of all public water systems. . . . Filtration and disinfection techniques have been widely proven to be effective in removing bacterial and some viral contaminants from water. The [SDWA] requires the Administrator to promulgate treatment technique regulations for filtration and disinfection to assure that all public water systems are providing basic health protection to their customers.

S.Rep. No. 99–56, at 2, 7 (1986).

3. The introductory paragraph of 40 C.F.R. § 141.73 states:

> A public water system that uses a surface water source . . . and does not meet all of the criteria in § 141.71(a) and (b) for avoiding filtration, must provide treatment consisting of both disinfection, as specified in § 141.72(b), and filtration treatment which complies with the requirements of paragraph (a), (b), (c), (d), or (e) of this section by June 29, 1993, or within 18 months of the failure to meet any one of the criteria for avoiding filtration in § 141.71(a) and (b), whichever is later. Failure to meet any requirement of this section after the date

guidance issued by the EPA in 1992 gave state enforcement agencies discretion to defer a final filtration determination if it appeared that a water system through intermediate measures could bring itself into compliance with the avoidance criteria.[4]

While the EPA was given the lead role in insuring the safety of public drinking water, Congress intended that the States also participate in the enforcement process. Thus, States whose drinking water regulations are at least as strict as those prescribed by the EPA are given "primary enforcement responsibility" for the integrity of public water systems within their jurisdiction. 42 U.S.C. § 300g–2(a). The EPA, however, was authorized to bring an enforcement action if, after giving the appropriate State agency and the violator thirty days notice, the State failed to bring an action of its own. 42 U.S.C. § 300g–3(a)(1)(B). The EPA granted primary enforcement responsibility to the DEP on June 28, 1993. 58 Fed.Reg. 34,583 (1993).[5]

The DEP's drinking water regulations, like the SWTR, provide that the filtration requirement is triggered by either a state filtration determination or by a failure of a water system to meet one or more of the filtration avoidance criteria. 310 CMR 22.20A(2); 310 CMR 22.20A(4). The DEP regulations specifically preclude further administrative review once a filtration determination is made.

A determination following the hearing that a supplier of water must provide filtration will not be subject to further review; a determination that a supplier of water meets all of the criteria for avoiding filtration will be subject to the Department's on-going review. In the event the Department finds that a supplier of water no longer meets any one of the criteria for avoiding filtration, the Department will issue a determination in writing that will be subject to review at a public hearing in accordance with 310 CMR 22.20A(7).·

310 CMR 22.20A(7)(d).

## FACTS

The material undisputed facts are drawn from the parties' First Factual Stipulation, plaintiff's Statement of Undisputed Facts (and defendants' responsive commentary), plaintiff's Submission of New Information, and certain facts admitted during oral argument.

The MWRA and the MDC own and operate the collection, treatment, distribution, and storage facilities that supply drinking water to some forty municipalities in the metropolitan Boston area. Water is transferred from the MWRA's main storage facility, the Quabbin Reservoir in central Massachusetts, through the Quabbin Aqueduct to the Wachusett Reservoir in and around Boylston. The Wachusett Reservoir is also fed by tributary rivers and streams comprising the Wachusett watershed, a 108 square mile drainage basin. At the eastern end of the Wachusett Reservoir, water enters the Cosgrove Tunnel at the Cosgrove Intake. The Cosgrove Tunnel feeds the Hultman Aqueduct which branches at Framingham in two directions. The smaller branch, the Weston Aqueduct, empties into the Weston Reservoir in Weston. (The Weston Aqueduct and the Weston Reservoir have been off-line for several years.) The main branch continues to the Norumbega Reservoir, also located in Weston. A portion of the water delivered by the Hultman Aqueduct replenishes the Norumbega Reservoir from which the MWRA draws water to meet periods of peak demand. The remainder flows

---

specified in this introductory paragraph is a treatment technique violation.

**4.** The MWRA argues vigorously that this discretion has not been exercised (as its own case illustrates) with the bridled circumspection that the government postulates. It points to a number of water systems that were given filtration avoidance determinations by the EPA after the December 30, 1991 deadline.

**5.** The DEP adopted regulations conforming to the SWTR on October 26, 1990. See 310 CMR 22.20A.

through various connecting tunnels to metropolitan Boston customers.[6] Water is treated with chlorine as it leaves the Wachusett Reservoir, and again as it leaves the Norumbega Reservoir. The water is also adjusted for pH content at a corrosion control facility in Marlborough.[7]

In 1991, after reviewing a 1989 consultant's report and testing various treatment alternatives, the MWRA's Board of Directors concluded that the MWRA would be unable to meet the filtration avoidance criteria. Consequently, it did not seek an avoidance determination from the DEP prior to December 30, 1991 (the SWTR cut-off date). On January 24, 1992, the DEP ordered the MWRA to provide filtration and disinfection treatment for Wachusett Reservoir source water by June 30, 1993.

Following the DEP determination, the DEP and the MWRA began negotiating an Administrative Consent Order ("ACO") to achieve compliance with the SWTR. The final version of the ACO laid out a "dual track" compliance program. The MWRA and the MDC were to prepare a watershed protection plan for the Wachusett Reservoir basin and implement other measures intended to bring the MWRA's system within the filtration avoidance criteria. Consistent with this objective, the ACO included a "reopener" clause permitting the MWRA to seek a redetermination of filtration avoidance on or before August 3, 1998. The MWRA was to simultaneously take steps to bring a Wachusett Reservoir filtration and disinfection treatment facility on-line by December 31, 2001, should the avoidance strategy fail.[8]

On June 3, 1993, Jeffry Fowley, the EPA's Associate Regional Counsel for Water, wrote to the DEP and the MWRA promising that if the ACO were signed prior to July 1, 1993, the EPA would stay the bringing of any federal enforcement action. Emphasizing, however, that the EPA was not bound by the terms of the ACO, Fowley cautioned that "the [proposed] Consent Order requires ... the MWRA ... to construct filtration facilities unless it can demonstrate by August 3, 1998, and the DEP approves, that it meets all of the avoidance requirements." On June 11, 1993, the ACO was signed.[9]

Over the next three years, the EPA voiced no objection to the reopener clause. On May 5, 1995, John DeVillars, the EPA Regional Administrator, wrote to the Chair of the Wachusett and Sudbury Watershed Advisory Committee stating that a filtration decision would not be made before 1998. DeVillars repeated this position in a November 14, 1996 letter to state officials criticizing their progress in implementing the Wachusett watershed protection plan.[10]

6. The Towns of Marlborough, Southborough, Framingham and Weston receive their water upstream of the Norumbega Reservoir. Northborough receives its water directly from the Wachusett Reservoir. All other customers are downstream of the Norumbega Reservoir.

7. Pursuant to an Administrative Consent Order (discussed below), the MWRA is constructing a chlorine treatment facility at Walnut Hill in Marlborough which will be served by a 17.6 mile tunnel (the Metrowest Water Supply Tunnel) running from Marlborough to Weston. The completion of the tunnel (scheduled for the end of 2003) will allow the MWRA to discontinue use of the Norumbega Reservoir. The MWRA plans to consolidate all of its treatment facilities at the Walnut Hill site by April 30, 2004.

8. The MWRA was also obligated to complete the design of the filtration plant by April 29, 1998, implement a Wachusett Reservoir watershed protection plan by July 31, 1998, and close the Norumbega Reservoir by December 31, 2000.

9. On February 1, 1995, the ACO was amended to revise its reporting requirements.

10. In the May 5, 1995 letter, DeVillars stated that "[t]he final answer on whether filtration is needed will be made in 1998, by the state Department of Environmental Protection, but subject to Environmental Protection Agency (EPA) review. In making its judgment, the EPA will need to look at all the facts, circumstances and legal requirements as they exist then." In the November 14, 1996 letter, DeV-

In early 1997, the EPA began raising concerns that the MWRA was failing to meet the "key deadlines" of the ACO. On September 18, 1997, the DEP and the MWRA agreed (without the EPA's participation) to amend the ACO by postponing the date for completing the last of the design packages for the filtration plant to January 31, 2002, and the date for completing construction of the plant itself to December 31, 2003.[11] Under the amended ACO, the deadline for requesting filtration avoidance remained essentially unchanged (July 31, 1998).

On October 1, 1997, the MWRA and the MDC jointly filed a "Request for Review and Revision of DEP Determination that Filtration is Required for Wachusett Reservoir." On December 9, 1997, DeVillars wrote to the DEP and the MWRA stating that the EPA had requested the Department of Justice to file an enforcement action based on the MWRA's failure to meet the filtration avoidance criteria by December 30, 1991. According to DeVillars "[t]he MWRA did not meet these criteria in 1991, has not met them to this day, and will not meet them by next summer, either."[12] The United States filed this action on February 12, 1998. The court, while permitting some preliminary discovery, essentially stayed the case pending the DEP's decision on the MWRA's request for an avoidance determination.

On November 13, 1998, the DEP issued a determination that the MWRA's water system met the avoidance criteria of the SWTR.[13] While this determination might have been conclusive of the litigation, in December of 1998 and January of 1999, "there were at least 14 occasions when the fecal coliform concentrations in the water at the Cosgrove Intake (at the Wachusett Reservoir) exceeded 20 fecal coliform colony forming units ('cfu') per 100 milliliters of water ('20 cfu/100 ml'). As a result, the 20 cfu/100 ml limit was exceeded in more than 10 percent of the measurements taken over the six month period ending January 31, 1999. The avoidance criterion at 40 C.F.R. § 141.71(a)(1) was therefore violated." Submission of New Information by the United States, Docket # 82. The MWRA does not dispute the essential accuracy of the government's submission or the fact that the DEP avoidance determination is, as a result, of no effect.

## DISCUSSION

■ The MWRA's concession of violations of the fecal coliform avoidance criterion following the DEP's November 13, 1998 avoidance determination entitles the EPA to a judicial declaration that the MWRA is liable under the SDWA for injunctive relief and civil penalties. 42 U.S.C. § 300g–3(i). An issue remains, however, as to the nature and scope of the relief to which the United States is entitled. Insofar as the United States is concerned, the answer to this question is straight-forward—the court has no alternative but to order the MWRA to begin filtering its water.

---

illars noted that "August 1998 is rapidly approaching and all of these issues, and more, will need to be resolved by that time in order to avoid the necessity of constructing a filtration plant."

11. The date for the closing of the Norumbega Reservoir was also extended to December 31, 2004.

12. It is undisputed that the MWRA did not meet the avoidance criteria as of December 30, 1991. It is also undisputed that the MWRA periodically failed to meet one or more of the avoidance criteria between January of 1992 and July of 1998, although the parties dispute at length the frequency and magnitude of the violations. See Government's Statement of Undisputed Facts, at 28–65. Compare MWRA Response, at 14–45. The dispute is immaterial given the MWRA's concession that subsequent to the DEP's 1998 filtration avoidance determination, it fell out of compliance, albeit marginally, with the fecal coliform criterion.

13. On December 12, 1997, the DEP provisionally rejected the MWRA's request for an avoidance determination, but gave the MWRA to October 31, 1998, to supplement its request.

Two principle features of the SWTR indicate that the *only* way compliance can be achieved here is for the MWRA to provide filtration. First, the SWTR by its terms specifies a treatment technique, such that, once the supplier fails to meet one or more of the avoidance criteria, filtration must be provided; the supplier is not permitted to choose a non-filtration technology to treat the water. The requirement is fundamentally different than an MCL, which a water supplier can comply with by using the treatment technology of its choice. To allow the MWRA to avoid the treatment technique specified by the SWTR would be irreconcilable with this feature of the Rule.

Second, the structure of the SWTR reflects a fundamentally conservative approach toward protecting the public health. It mandates filtration generally, and establishes an exception *only* for those systems that were able consistently to deliver water so clean that they could readily and promptly meet the avoidance criteria by December 30, 1991, and continue to meet the criteria thereafter. The Rule precludes an extended period of time or repetitive attempts to meet the avoidance criteria. In essence, the SWTR incorporates a philosophy of, "when in doubt, filter."

Government's Memorandum, at 30.

While I believe this to be a fair reading of the SWTR, the judicial enforcement provision of the SDWA, 42 U.S.C. § 300g–3(b), is phrased more broadly.

The court may enter, in an action brought under this subsection, such judgment as protection of public health may require, taking into consideration the time necessary to comply and the availability of alternative water supplies; and, if the court determines that there has been a violation of the regulation or schedule or other requirement with respect to which the action was brought, the court may, taking into account the seriousness of the violation, the popula-

tion at risk, and other appropriate factors, impose on the violator a civil penalty of [sic] not to exceed $25,000 for each day in which such violation occurs.

■ While there is no doubt that Congress, in enacting a statute, "may intervene and guide or control the exercise of the courts' discretion," its decision to do so is not to be "lightly assume[d]," especially in the absence of a clear legislative command. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences or doubtful construction.'" Id., quoting from *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

The most explicit Congressional statement clarifying the intent of § 300g–3(b) appears in the House Conference Committee Report on the 1974 enactment of the SDWA. The Conference Report states that:

[t]he Committee intends that courts which are considering remedies in enforcement actions under this section are not to apply traditional balancing principles used by equity courts. Rather they are directed to give utmost weight to the Committee's paramount objective of providing maximum feasible protection of the public health.

H.R.Conf.Rep. No. 93–1185, at 23 (1974).

■ In emphasizing its overriding goal of protecting the public health, Congress did not, however, say that a court was to limit itself to mechanical enforcement of EPA compliance orders. Had it been Congress's intent to strip the courts of their equitable powers, one would think that it would have drafted § 300g–3(b) to say so, for example, by imposing the same narrow mandate on the courts that it im-

posed on the EPA in § 300g–1(b)(7)(C)(i). Instead Congress used language descriptive of the traditional powers of a court of chancery. Why Congress might not have wanted to eliminate judicial discretion in ordering compliance with the SDWA is not difficult to imagine. Technology evolves more rapidly than typically does legislation, and there is an inherent danger in attempting to legislate today's science as the foreordained solution for tomorrow's problems. Congress may also have been concerned that an overly rigid application of the filtration mandate by the EPA might result in a wasteful expenditure of finite public funds to correct *de minimis* problems, or even exacerbate problems that the legislators had not foreseen. Cf. *United States v. City of San Diego*, 1994 WL 521216, at 8 (S.D.Cal.1994); 33 U.S.C. § 1311(j)(5). In sum, while the issue is by no means open and shut, I agree with the MWRA that the SDWA does not deprive a court of discretion in fashioning remedies for a violation of the SWTR. See MWRA Memorandum, at 38.

This is not to say that the MWRA is thereby automatically relieved of the obligation to filter its water, particularly in light of the presumption expressed by Congress in the SDWA that filtration will almost always be the preferred remedy for a SWTR violation. Thus, the issue is a very narrow one. Will the MWRA's alternative strategy of ozonation, chlorination, and pipe replacement better serve Congress's objective of providing "maximum feasible protection of the public health" than will the EPA's insistence on filtration? While the parties have presented conflicting scientific affidavits on this subject, neither has yet had the opportunity to depose and cross-examine the competing experts.

### ORDER

For the foregoing reasons, the motion of the United States for partial summary judgment is *ALLOWED*. The court *ADJUDGES* and *DECLARES* that the MWRA is presently in violation of the filtration avoidance criteria of the SWTR and that DEP's November 13, 1998 avoidance determination is of no effect. Further discovery will proceed according to the provisional schedule adopted by the court at the status conference held on Tuesday, April 27, 1999. The court will conduct an evidentiary hearing on the appropriate form of relief to be awarded to the United States commencing at 9:00 A.M., Thursday, October 14, 1999.

SO ORDERED.