# United States Court of Appeals
## For the First Circuit

---

No. 00-2028

UNITED STATES,

Plaintiff, Appellant,

v.

MASSACHUSETTS WATER RESOURCES AUTHORITY;
METROPOLITAN DISTRICT COMMISSION,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Stahl, Senior Circuit Judge.

---

Robert H. Oakley, Attorney, with whom Greer S. Goldman, Attorney, Brian Donohue, Attorney, Steve Keller, Attorney, Scott Bauer, Attorney, Lois J. Schiffer, Assistant Attorney General, George B. Henderson, II, Assistant United States Attorney, and Donald K. Stern, United States Attorney, were on brief, for appellee.
John M. Stevens, Jonathan M. Ettinger, Jack W. Pirozzolo, Foley, Hoag & Eliot LLP, and Nancy C. Kurtz, were on brief, for appellant.
Alexandra D. Dawson on brief for Nashua River Watershed Association, Inc., Massachusetts Audubon Society, Inc., Friends of Quabbin, Inc., Water Supply Citizens Advisory Committee, and Rutherford H. Platt, amici curiae.

**STAHL, Senior Circuit Judge**. The federal Safe Water Drinking Act (SDWA or Act) authorizes the Environmental Protection Agency (EPA) to prescribe criteria specifying when public water systems are "required" to install a filtration system. The Act also provides, however, that courts asked to issue an injunction enforcing the EPA's filtration standards "may enter . . . such judgment as protection of public health may require . . . ." This appeal requires us to resolve the apparent tension between these two provisions. Specifically, we must decide whether the SDWA requires courts to order the statutorily prescribed remedy of filtration for violations of its substantive provisions and the regulations promulgated thereunder, or, alternatively, whether courts have the authority in SDWA cases not to order such remedies in those instances where the equities are found to counsel forbearance. Suffice it to say, we are not faced with an imminent threat to the public health in this case; none has been alleged by the United States on appeal. Rather, this dispute mainly has to do with the operation of an EPA rule that purports to oblige public water systems to install a filtration system if they fail to meet certain regulatory standards by a prescribed deadline -- an

obligation that extends into the future indefinitely, and that does not account for the present and future safety of the system's drinking water.

Based on our reading of the Act, we find that the district court acted within its discretion by declining to order that the Massachusetts Water Resources Authority (MWRA) install a filtration system. We therefore affirm its judgment.

## I. Background

The facts surrounding this controversy are laid out in extensive detail in the district court's two written opinions, <u>United States</u> v. <u>Mass. Water Res. Auth.</u>, 48 F. Supp. 2d 65 (D. Mass. 1999) (<u>MWRA I</u>) (holding that district court had equitable discretion not to order filtration remedy for SDWA violation); <u>United States</u> v. <u>Mass. Water Res. Auth.</u>, 97 F. Supp. 2d 155 (D. Mass. 2000) (<u>MWRA II</u>) (declining to order filtration remedy based on equities of the case), and so we confine our recitation to those facts bearing specifically upon this appeal.

A.      <u>Regulatory Regime</u>

In 1974, Congress, legislating in an area that had previously received scant attention under federal law, passed the Safe Drinking Water Act, Pub. L. No. 93-523, 88 Stat. 1660 (codified as amended at 42 U.S.C. §§ 300f to 300j-8 (1991 & Supp. 2000)), with the basic goal of protecting the purity of the drinking water provided by the nation's public water

systems.[1]  To this end, the Act vests authority in the EPA to promulgate and enforce two types of water-purity standards: maximum contaminant levels (MCLs) and treatment techniques. Under the Act, the EPA is to regulate the majority of contaminants in drinking water by formulating MCLs -- numerical standards that represent the agency's expert determination as to "the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety."  Id. § 300g-1(b)(4)(A).  By contrast, the EPA only may require the implementation of specific treatment techniques, consisting of engineering or design standards, in instances where the Administrator deems it infeasible, for technological or economic reasons, to ascertain an acceptable concentration level for the contaminant.  Id. § 300g-1(b)(7)(A).  As originally written, the SDWA did not specifically require that the EPA develop either MCLs or treatment techniques with respect to any particular contaminant.  As a result, between 1974 and 1986 the EPA promulgated regulations concerning only twenty-three drinking water contaminants, and of these pollutants, all but one had previously been subject to regulations issued by the

---

[1]Under the SDWA, the term "public water system" encompasses any "system for the provision to the public of piped water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals."  42 U.S.C. § 300f(4)(A).

Public Health Service. James Kavanaugh, Comment, <u>To Filter or Not to Filter: A Discussion and Analysis of the Massachusetts Filtration Conflict in the Context of the Safe Drinking Water Act</u>, 26 B.C. Envtl. Aff. L. Rev. 809, 814 (1999).

In 1986, however, Congress amended the Act so as to require (rather than merely to authorize) the EPA to develop treatment regimes with respect to scores of additional contaminants, and to require that violations of the Act's substantive provisions and the rules promulgated thereunder be prosecuted by either the states or the EPA. <u>Id.</u> at 814-15. These amendments were prompted by the EPA's perceived laxity in issuing rules under and enforcing the SDWA, <u>see</u> 2 William H. Rodgers, Jr., <u>Environmental Law</u>, § 4.20A, at 152 (Supp. 2001) ("In making these changes Congress [was] convinced that it [could] control prosecutorial options [under the SDWA] by replacing 'mays' with 'shalls' in its enforcement instructions."), and by anecdotal evidence suggesting a rise in biological and chemical contamination of public water supplies throughout the United States.

Through these amendments, Congress also expressed a growing preference for the employment of specific treatment techniques, as opposed to the promulgation of MCLs, to solve the problem of contaminated drinking water. This policy shift occurred as the result of mounting scientific evidence

demonstrating the efficacy of filtration and disinfection techniques in reducing waterborne viral and bacterial contamination. Id., § 4.20A, at 151. Reflecting this view, Congress specifically required that disinfection be employed by all public water systems to reduce the live quantities of those pathogens, except for systems specifically eligible to receive a variance from the EPA. 42 U.S.C. § 300g-1(b)(8). Congress also changed the SDWA to provide for filtration of public water systems. Id. § 300g-1(b)(7)(C)(i). But unlike the disinfection mandate, filtration was not directly imposed upon all public water systems; rather, Congress provided that the EPA "shall propose and promulgate . . . criteria under which filtration . . . is required as a treatment technique for public water systems supplied by surface water sources." Id.

On June 29, 1989, pursuant to this statutory command, the EPA promulgated the Surface Water Treatment Rule (SWTR or Rule), 40 C.F.R. §§ 141.70-.73. The SWTR focuses on public systems that draw their water in some measure from above-ground sources. It seeks to reduce the risk of illness from waterborne pathogens to one yearly occurrence per 10,000 consumers of water from covered public systems. Drinking Water; National Primary Drinking Water Regulations; Filtration, Disinfection; Turbidity, Giardia lamblia, Viruses, Legionella, and Heterotrophic Bacteria, 54 Fed. Reg. 27,486, 27,490 (June 29, 1989) (codified

at 40 C.F.R. pts. 141 and 142).  Specifically, the Rule requires that all public systems achieve a three-log (99.9 percent) reduction in the <u>Giardia</u> <u>lamblia</u> parasite and a four-log (99.99 percent) reduction in viral contamination, 40 C.F.R. § 141.70(a); establishes a mandatory disinfection requirement for all systems, subject to the granting of variances by the EPA, <u>id.</u> § 141.72; specifies the standards according to which all filtration systems must be constructed, <u>id.</u> § 141.73; and sets out eleven "avoidance criteria" for levels of certain waterborne contaminants that all public water systems hoping to forego filtration must satisfy, <u>id.</u> §§ 141.71(a)-(b).[2]  On December 16, 1998, in response to an additional amendment to the SDWA passed in 1996, <u>see</u> 42 U.S.C. § 300g-1(b)(2)(C) (Supp. 2000), the EPA promulgated the Interim Enhanced Surface Water Treatment Rule (IESWTR), 40 C.F.R. §§ 141.170-.173, which requires that public water systems implement treatment techniques with respect to the protozoan <u>Cryptosporidium</u> <u>larvum</u>, whose presence in public water systems has risen in the past two decades and which has been demonstrated to cause significant health problems, particularly for those individuals with weakened immune systems.  This Rule, whose requirements must be met by public water systems by the

---

[2]Of the eleven "avoidance criteria," two relate to source water quality, four concern minimum levels of disinfection, and five involve system-specific watershed protection and operations requirements.  40 C.F.R. §§ 141.71(a)-(b).

end of 2001, requires a two-log (99 percent) reduction in Cryptosporidium by all water systems that employ filtration, and an extension of watershed controls to cover Cryptosporidium for all unfiltered water systems. Id. § 141.173(b).

The filtration mandate in the SWTR is written in unequivocal -- and, in the context of federal regulations, unusually broad -- terms. Tracking the pertinent deadlines embodied in the Act, the Rule requires that public water systems not meeting all of the avoidance criteria by December 30, 1991, "must provide treatment consisting of both disinfection . . . and filtration" by June 29, 1993, or, if the violation occurs after December 30, 1991, within eighteen months of the date that the violation has been established. Id. § 141.73 (emphasis added). Moreover, filtration decisions under the Rule are final, in that the Rule provides no mechanism by which a public water system may petition for a reopening of a filtration determination. See id. The upshot of this regulatory scheme is that once a public water system has been found to have violated one of the avoidance criteria, it forever remains subject to an enforcement suit requesting the installation of a filtration system.[3] This result obtains no matter how safe the system's

---

[3]The SDWA contains no statute of limitations, and "an action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it." E.I. Dupont de Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924); cf. United

drinking water is following the violation, and regardless of how diligent the water system is in remedying the problems that caused the avoidance-criteria failures in the first place.

Despite the mandatory nature of the Rule regarding the need for filtration, the EPA cannot compel a violator to comply with its provisions merely by issuing its own enforcement order.[4] Rather, the agency must bring suit in federal district court to request that a remedy provided for elsewhere in the Act, such as the construction of a filtration facility, be ordered. See 42 U.S.C. § 300g-3(b) ("The [EPA] Administrator may bring a civil action . . . to require compliance with any applicable requirement . . . ."). And the Act provides that in deciding such suits, courts "may enter . . . such judgment as protection of public health may require, taking into consideration the time necessary to comply and the availability of alternative water supplies." Id. The language of this judicial-enforcement

_____

States v. Telluride Co., 146 F.3d 1241 (10th Cir. 1998) (refusing to apply general five-year statute of limitations for civil actions by the United States to enforcement suits under Clean Water Act because statute of limitations does not cover claims for equitable relief).

[4]Without resort to judicial process, however, the EPA may impose a civil penalty not exceeding $25,000 per day for violations of administrative orders. 42 U.S.C. § 300g-3(g)(3)(A).

provision has remained untouched, in pertinent part, since the Act's original passage in 1974.[5]

As a practical matter, much of the burden of enforcing the SDWA falls on the shoulders of state environmental authorities, such as the Massachusetts Department of Environmental Protection (DEP). This is so because, under the Act, state agencies that adopt drinking water regulations deemed by the EPA to be at least as stringent as its own may assume primary responsibility for identifying violations of the EPA's regulations and for enforcing the filtration requirement against the violators. Id. § 300g-2(a). The Act provides that within thirty months of the promulgation of the SWTR, those state agencies that participate in SDWA enforcement must identify the water systems that are required to install filtration facilities.[6] Id. § 300g-1(b)(7)(C)(iii). Although state

_____

[5]In 1986, Congress amended § 300g-3(b) by increasing the maximum available civil penalties under the Act from $5,000 per day to $25,000 per day, and by eliminating the requirement that an SDWA violation must be "willful" in order to be the basis for civil penalties. And in 1996, Congress substituted the term "any applicable requirement" for "a national primary drinking water regulation" to reflect the semantic changes effected by the 1986 amendments to the Act.

[6]In 1996 Congress once again amended the SDWA to permit the EPA to excuse from filtration certain public water systems that draw water from uninhabited, undeveloped watersheds over which the public water system has "consolidated" (i.e., sole) ownership of the surrounding lands. 42 U.S.C. § 300g-1(b)(7)(C)(v). The MWRA, however, does not qualify to take advantage of the exception because it does not have consolidated ownership of the land surrounding its reservoirs.

authorities are afforded the first opportunity under this system to make formal determinations regarding the need for filtration, the EPA must bring its own enforcement action in the absence of such a state determination, provided the state agency and the violating water system are given thirty days' notice and an opportunity for consultation with the EPA. Id. § 300g-3(a)(1)(B).

On June 28, 1993, after the DEP adopted drinking water regulations requiring filtration whenever a public water system fails to satisfy the SWTR's avoidance criteria, see Mass. Regs. Code tit. 310, §§ 22.20A(2), (4), the EPA granted primary enforcement responsibility to the DEP. Public Water Supervision: Program Revision for Commonwealth of Massachusetts, 58 Fed. Reg. 34,583 (June 28, 1993).

B.      The MWRA

Established in 1984, the MWRA owns and operates the public water system that provides most of the drinking water for the city of Boston and surrounding communities. Its water system serves approximately two million customers in over forty Massachusetts cities and towns. The MWRA has primary responsibility for treating its drinking water and transporting that water from its reservoirs to the distribution systems of the local communities it serves. In providing water to its customers, the MWRA works in tandem with the Metropolitan

District Commission (MDC), an organization responsible for monitoring the quality of water in the MWRA system and managing the watersheds surrounding the principal sources of the MWRA's water supply.[7]

The MWRA's water system, which was originally designed by the Massachusetts Board of Health in the late nineteenth century, consists of three large reservoirs connected by a network of 265 miles of water mains and 130 miles of aqueducts. Feeding into the system are two above-ground bodies of water in central Massachusetts, the Quabbin and Wachusett Reservoirs, which collectively contain approximately 475 billion gallons of water. The Quabbin Reservoir, by far the larger of the two bodies of water, empties into the Wachusett Reservoir. The MWRA draws water from the eastern edge of the Wachusett Reservoir at the Cosgrove Intake, and transports the water through a series of tunnels and aqueducts until it reaches the Norumbega Reservoir, an intermediate storage basin in Weston, Massachusetts. From there the water travels in all directions, through a complex, 6,700-mile web of additional tunnels, pipes,

---

[7]Even though the MDC was named as a defendant in this lawsuit by virtue of its ownership and control of many of the water-treatment facilities in question, the United States did not allege in the district court, nor does it allege before this court, that the MDC violated any laws with respect to this controversy. We therefore refer to the appellees throughout this opinion as "the MWRA," except where it is necessary to distinguish between the two entities.

and aqueducts, ultimately connecting to the local distribution centers in the various communities that the MWRA serves.

For some time, the MWRA has employed two basic techniques to treat its drinking water: disinfection, used to kill live contaminants, and corrosion control, used to minimize the leaching of metals (such as lead) into the water from the antiquated pipes through which the water travels before reaching the taps of consumers. The water supply undergoes disinfection as it enters the distribution system through the Cosgrove Intake and again as it departs the primary distribution system at the Norumbega Reservoir. In the mid-1990s, the MWRA replaced the chloramine disinfection treatment it used at the Cosgrove Intake with an alternative disinfection treatment of ozonation, which consists of the injection of ozone bubbles into the water supply.[8] According to the MWRA, ozonation kills a wider range of pathogens than do the traditional disinfection techniques, and the process provides the added benefit of improving the taste and coloration of treated water. While the EPA acknowledges the general effectiveness of ozonation, the agency has taken the position that it is not, by itself, an effective substitute for filtration.

_____

[8]The MWRA continues to use chloramine disinfection at the Norumbega Reservoir site.

-13-

In the months following the EPA's formulation of the SWTR, the MWRA determined that it would not be able to fulfill all of the avoidance criteria by the December 30, 1991 deadline. In particular, the MWRA concluded that occasional spikes in fecal coliform bacteria that had been measured in the Wachusett Reservoir in the late 1980s and early 1990s, a phenomenon later attributed to the seasonal roosting habits of gulls, could not be controlled by that date. Consequently, the MWRA did not seek a formal avoidance determination from the DEP. On January 24, 1992, the DEP notified the MWRA that, according to the terms of the SDWA, it would be required to install a filtration system by June 30, 1993.

By early 1993, after it became clear that the MWRA could not design and install a filtration system before June 1993, the MWRA, the MDC, and the DEP entered into negotiations on an administrative consent order (ACO) to govern the MWRA's compliance with the SWTR. Rather than requiring the immediate installation of a filtration system, the ACO established a "dual-track" approach for compliance. Under this scheme, the MWRA was permitted in the short term to employ a treatment regime consisting of disinfection, ozonation, and covered water storage facilities, while at the same time embarking upon an aggressive watershed protection plan for the Wachusett Reservoir. The MWRA also was expected to continue its campaign

-14-

of "gull harassment," a policy meant to scare away birds so as to prevent them from defecating in the reservoir.  If the MWRA properly pursued these endeavors, it would be given the opportunity under the ACO to petition, on or before August 3, 1998, for a "reopener" establishing that the avoidance criteria had been met and that filtration was not required.[9]  At the same time as it pursued the watershed protection strategy, however, the MWRA also was obligated to plan the siting and design of the filtration facility that it would be required to install in the event that it could not establish its eligibility for filtration avoidance by August 1998.  The MWRA, the MDC, and the DEP signed the ACO on June 11, 1993.

Given that the ACO essentially excused the MWRA from complying with a key component of the SWTR, it seems rather surprising at first blush that the EPA, while aware of the negotiations over the ACO, did not attempt to block its implementation.  In fact, despite having written the Rule's filtration requirement in mandatory terms (and despite the Act's mandate that there be filtration when the Rule's standards were not met), the EPA's actual practice has been to enforce the filtration mandate with less than the unswerving rigor that the statutory and regulatory language would seem to require.  For

_____

[9]A subsequent amendment to the ACO pushed back to October 31, 1998, the MWRA's target date for demonstrating compliance with the avoidance criteria.

-15-

instance, notwithstanding the filtration command in the SWTR, in 1992 the EPA issued an internal guidance memorandum that gave state enforcement authorities the discretion to postpone final filtration determinations if a water system is able to prove that it could later meet the avoidance criteria through intermediate measures. And while the EPA never expressly acquiesced in the provision in the ACO that created the potential for the MWRA to eventually avoid filtration (in fact, it stated in a letter to the parties to the ACO that it reserved the right to bring an enforcement action at a later date), it did promise the DEP and the MWRA that it would abstain, at least in the short term, from filing its own enforcement suit once the ACO was executed.

Consistent with this approach, the EPA worked closely with the MWRA in its implementation of both compliance tracks in the three years following the signing of the ACO. This assistance included the agency's advice on steps to be taken by the MWRA to satisfy the avoidance criteria. In November 1996, John DeVillars, the EPA Regional Administrator, wrote a letter to the MWRA in which he generally commended the MWRA on its progress but cautioned that "in order to avoid filtration, more still needs to be done" (emphasis added). At least through the end of 1996, this statement epitomized the EPA's deliberately ambiguous posture vis-à-vis the MWRA's need to install

-16-

filtration: the agency generally supported the MWRA's efforts to achieve compliance with the avoidance criteria by alternative means, even as it held out the threat of suing to require filtration if it later found itself unsatisfied with the MWRA's performance.

In early 1997, after the MWRA acknowledged that it could not meet several interim deadlines contained in the ACO, the EPA began to lose patience, and the working relationship between the MWRA and the EPA quickly deteriorated. In two letters to the MWRA dated January 8, 1997, and May 15, 1997, the EPA Regional Administrator expressed "extreme concern" for the MWRA's failure to produce adequate design plans for a Wachusett Reservoir filtration facility, and reminded the MWRA that it was still in technical violation of the SWTR for its failure to install a filtration system back in 1993. The EPA's displeasure with the MWRA's approach was only exacerbated by a September 18, 1997 agreement between the DEP and the MWRA that amended the ACO to delay the completion of the design of the filtration plant until January 31, 2002.

On October 1, 1997, over a year before the MWRA was to have submitted its petition to reopen the filtration determination, the MWRA and the MDC filed with the DEP an early "Request for Review and Revision of DEP Determination that Filtration is Required for Wachusett Reservoir." This document

requested that the MWRA be excused from further pursuing the filtration track by the end of 1997 if it could establish prospective compliance with the SWTR's avoidance criteria.  The EPA, which was not consulted by the MWRA prior to the filing of this request, responded critically upon learning of it.  In a December 9, 1997 letter to the MWRA, the MDC, and the DEP, the EPA Regional Administrator revealed that he had asked the U.S. Department of Justice to bring an SDWA enforcement action to require "filtration . . . [and] measures to enhance protection of the Wachusett reservoirs . . . according to a clear, binding and expeditious schedule."  Such legal action was necessary, in his opinion, because the MWRA "did not meet the avoidance criteria in 1991, has not met them to this day, and will not meet them by next summer, either."

Three days after the EPA Regional Administrator sent this letter, the DEP issued a noncommittal response to the MWRA's request to forego filtration.  While refusing to allow work on the filtration track to be terminated in light of the MWRA's acknowledgment that it could not meet the avoidance criteria regarding Giardia, viruses, and total coliform counts by the end of 1997, the DEP did grant the MWRA until October 31, 1998, or nearly three months later than allowed by the ACO, to reapply for a filtration waiver.  Accepting that invitation, the MWRA submitted a follow-up request to the DEP on October 30,

1998.  In that request, the MWRA sought permission to treat its water using ozonation and chloramine disinfection only.  The MWRA also proposed that the savings realized from not installing a filtration facility be spent on a pipeline replacement plan and stepped-up monitoring program.  On November 13, 1998, the DEP formally approved the request, finding that the MWRA had come into compliance with all of the SWTR's avoidance criteria and concluding that the MWRA had developed satisfactory plans for improving the quality of its water.  The DEP's action effectively excused the MWRA from having to install a filtration system for the time being; however, the approval made clear that any future violation of any of the avoidance criteria would result in revocation of the waiver and reimposition of the filtration requirement.

C.       The Proceedings Below

Meanwhile, on February 12, 1998, the United States had filed the instant SDWA lawsuit on behalf of the EPA.  The lawsuit sought an injunction ordering the MWRA to comply with the filtration requirement set out in the Act and the Rule.  The district court, while permitting some initial discovery, effectively stayed the case for nearly a full year in anticipation of the DEP's disposition of the MWRA's filtration-waiver request.  Once the DEP approved the request, the United States moved for summary judgment, citing uncontradicted

evidence of the MWRA's past failures to meet the avoidance criteria and its continued refusal to install a filtration system. Its position was augmented by the MWRA's acknowledgment that, in January 1999, it had failed to meet one of the avoidance criteria at the Wachusett Reservoir -- in this case, the standard relating to fecal coliform concentration.[10] The EPA subsequently asked the DEP to revoke the MWRA's filtration waiver based on this violation, but the DEP declined to do so. Since the January 1999 avoidance-criteria failure, the MWRA's record of providing safe drinking water has been unblemished.

On May 3, 1999, the district court ruled on the United States's motion for summary judgment. While noting the DEP's November 1998 finding that the MWRA had come into compliance with all the avoidance criteria and opining that "this conclusion might have been conclusive of the litigation," the court found that the MWRA's January 1999 violation "entitles the EPA to a judicial declaration that the MWRA is liable under

_____

[10]The MWRA asserts that the January 1999 fecal coliform failure was illusory, in that the relevant water samples barely missed meeting the acceptable levels of bacterial colonies and that the testing during that period was conducted at tolerance levels and frequencies far more rigorous than those required by the SWTR and other EPA guidelines. The district court noted, however, that the MWRA failed to raise the testing-technique issue in opposition to the United States's motion for partial summary judgment. MWRA II, 97 F. Supp. 2d at 176. Consequently, it found the testing method used by the MWRA in January 1999 to be "a fact of no legal significance." Id. at 189.

the SDWA for injunctive relief and civil penalties." MWRA I, 48 F. Supp. 2d at 70.

The district court went on to hold, however, that, based on the principle that the discretion of courts to fashion equitable remedies as appropriate may only be circumvented by a "clear legislative command," the court retained the discretion to determine the type of relief that should be granted. Id. at 71 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982)). While acknowledging a statement in the Act's legislative history to the effect that courts shall not use "traditional balancing principles used by equity courts" in ruling on SDWA suits, id. (quoting H.R. Rep. No. 93-1185 (1974), reprinted in 1974 U.S.C.C.A.N. 6454, 6476), the court determined that the judicial-enforcement provision of the Act contained language "descriptive of the traditional powers of a court of chancery" and that the statute did not "impos[e] the same narrow mandate" on courts to enforce violations of its substantive provisions that it placed on the EPA to promulgate rules. Id. at 71. In the final analysis, the court discerned no clear command that courts "limit [themselves] to mechanical enforcement of EPA compliance orders," id., although it did find a "presumption expressed by Congress in the SDWA that filtration will almost always be the preferred remedy for a[n] SWTR violation." Id. at 72.

-21-

Having determined that it possessed the equitable discretion to withhold the filtration remedy, the district court ordered a bench trial to determine whether, in fact, it was appropriate to exercise such discretion with respect to the MWRA. As the court saw it, the issue to be tried was whether "the MWRA's alternative strategy of ozonation, chlorination, and pipe replacement [will] better serve Congress's objective of providing 'maximum feasible protection of the public health' than will the EPA's insistence on filtration." Id.

Between December 1999 and February 2000, the district court presided over a twenty-four day bench trial in which it heard from twenty-three witnesses and entered 524 exhibits into evidence. At trial, the United States sought to establish that filtration combined with disinfection is much more effective against highly treatment-resistant pathogens, such as Giardia and Cryptosporidium, than the ozonation alternative favored by the MWRA. It also sought to prove that the process of ozonation, while generally effective in combating most forms of live waterborne pathogens, may produce microbes that nourish certain types of bacteria, thereby creating the potential for "regrowth" of certain pathogens in the water supply. For its part, the MWRA noted that it was in compliance with the avoidance criteria at the time of trial, thereby removing the urgency of installing a filtration system. It further attempted

to demonstrate that its proposed approach of pipeline rehabilitation, watershed protection, and ozone and chloramine disinfection treatments would provide more comprehensive water purification than filtration alone.

The district court issued its findings of fact and conclusions of law on May 5, 2000, holding, for the first time, that the MWRA would not be required to install a filtration system under present circumstances. MWRA II, 97 F. Supp. 2d at 188. While finding that filtration combined with disinfection was a superior treatment technique to the MWRA's proposed "ozonation-only" strategy, the court determined that, given the lack of an actual health issue in light of the MWRA's compliance with the avoidance criteria at the time of trial, "[a]ny risk to public health entailed by selection of the 'ozone-only' option is within acceptable levels." Id. In making this determination, the court relied heavily on studies introduced at trial by the MWRA indicating that the ozonation technique could successfully keep the concentrations of pathogens in the water supply at or below the safety levels specified by the SWTR avoidance criteria. Id. It further found that, while the threat of bacterial "regrowth" posed by ozonation was real, that threat could more effectively be addressed through pipe rehabilitation,

flushing, and corrosion control than through filtration.[11]  Id.
Moreover, the court, noting the tremendous sums that the MWRA
was spending and had pledged to spend in subsequent years on
health-related system improvements,[12] accepted the MWRA's
argument that the installation of a $180 million filtration
system would severely complicate the MWRA's efforts to take on
other water purification projects, such as pipe replacement,
that would be needed with or without the presence of a
filtration system.  Id.  As to the issue of watershed
protection, the court agreed with the MWRA that the plan of
acquiring lands close to the Wachusett Reservoir had proven
successful in creating an effective barrier against manmade
contamination, and that the implementation of a filtration plan
would reduce popular support for maintaining strict
environmental protection of the protected areas.  Id. at 187-88.

---

[11]The district court noted that the possibility of "regrowth," without actual evidence of heightened levels of bacteria, was not a component of the SWTR's filtration-avoidance criteria.  Id. at 189.

[12]In particular, the court found that the MWRA had budgeted approximately $1.7 billion for four major (and needed) capital improvement projects: a new water supply tunnel; a covered-storage facility for treated water; a new disinfection facility; and an ongoing water-main rehabilitation project.  Id. at 169. Additionally, the district court found that the MWRA had instituted a successful grant program in which it was providing $25 million per year to its constituent cities and towns to improve the safety of their local water delivery systems.  Id.

In sum, the district court found the MWRA's proposed treatment plan to be a "sound alternative to . . . filtration when competing demands for limited resources and the level of risk from all potential threats to the safety of MWRA water are considered." Id. at 189. The court determined that, in light of the ACO, only one avoidance criteria violation remained relevant -- the fecal coliform violation in January 1999 -- and that, based on that single SWTR violation and the myriad efforts undertaken by the MWRA to improve the quality of its water, the United States had not demonstrated that reallocating funds from the MWRA's planned health-related system improvements to filtration was warranted. Id. Consequently, the court denied the United States's request for injunctive relief. Id. It retained jurisdiction, however, to facilitate reexamination of the decision in the event that future circumstances warrant it. Id. This appeal followed.

## II. Equitable Discretion under the SDWA

On appeal, the United States does not challenge any of the district court's factual findings, including the court's determination that the MWRA's "ozonation-only" approach is an acceptable alternative to filtration. Nor does the United States assert that the district court abused its equitable discretion by declining to order filtration in light of the

-25-

MWRA's history of avoidance-criteria noncompliance.[13]  Instead,
its appeal essentially is confined to one argument: that under
the SDWA, courts have <u>no</u> discretion to withhold <u>indefinitely</u> a
provided-for remedy, such as filtration, if it has been
demonstrated that a public water system has violated a
substantive requirement of the Act.  The district court's
determination regarding the scope of its equitable discretion
presents a pure issue of law, and so we review that
determination <u>de</u> <u>novo</u>.  <u>Fergiste</u> v. <u>INS</u>, 138 F.3d 14, 17 (1st
Cir. 1998).

In this case, the United States seeks to bring the MWRA
into compliance with the filtration requirement by resort to the
SDWA's statutory injunction provision, 42 U.S.C. § 300g-3(b).
The role a court plays in deciding whether to grant a statutory
injunction is different than the one it plays when it weighs the
equitable claims of two private parties in a suit seeking
injunctive relief.  <u>Yakus</u> v. <u>United States</u>, 321 U.S. 414, 441

---

[13]The United States does suggest that the district court
erred by discounting the MWRA's pre-1999 avoidance-criteria
violations in its decision not to order filtration.  It also
contends that it has not been estopped from pointing out the
MWRA's pre-1999 violations by its failure to block the ACO.
However, as the United States states in its brief, under its
theory of the case -- that a district court does not have the
discretion to excuse SWTR violations -- the additional
violations are essentially irrelevant, as even one failure to
meet the avoidance criteria after the December 30, 1991 deadline
creates an ongoing violation that triggers the filtration
obligation under the Rule.

(1944). This is so because a court asked to order a statutory injunction must reconcile two sets of competing concerns. Courts asked to issue an injunction must ordinarily assume the role of a court of chancery -- a role that requires them to determine whether the equities of the case favor, and whether the public interest would be served by, the granting of injunctive relief. See United States v. Oakland Cannabis Buyers' Coop., ___ U.S. ___, 121 S. Ct. 1711, 1720 (2001) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (quoting Romero-Barcelo, 456 U.S. at 312). But in the context of statutory injunctions, the court's freedom to make an independent assessment of the equities and the public interest is circumscribed to the extent that Congress has already made such assessments with respect to the type of case before the court. Burlington N. R.R. v. Bair, 957 F.2d 599, 601-02 (8th Cir. 1992) (citing Atchison, Topeka & Santa Fe Ry. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981) (per curiam)); cf. Clark v. Smith, 38 U.S. (13 Pet.) 195, 203 (1839) (finding "inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature").

In its decisions addressing this complicated area of law, the Supreme Court has held repeatedly that the retention of a court's discretion to shape an injunction authorized by

statute to the equities of the case -- or not to issue an injunction at all -- is to be presumed, but that this presumption may be overcome by a proper showing of congressional intent. "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." Romero-Barcelo, 456 U.S. at 313; see also id. at 322 (Stevens, J., dissenting) ("Unless Congress specifically commands a particular form of relief, the question of remedy remains subject to a court's equitable discretion."); Town of Huntington v. Marsh, 884 F.2d 648, 651 (2d Cir. 1989) ("[I]n the area of environmental statutes, the Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon a finding of a statutory violation."). And while Congress certainly may intervene and guide or control the exercise of the courts' discretion, or even extinguish it entirely, courts measuring the quantum of equitable discretion preserved in a statute are "not lightly [to] assume that Congress has intended to depart from established principles." Romero-Barcelo, 456 U.S. at 313 (citing Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)). This default rule can be justified, at least in part, by the fact that "[w]hen Congress entrusts to an equity court the enforcement of prohibitions contained in a

regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes."  Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291-92 (1960).  In this vein, the Supreme Court has held that if Congress wishes to circumscribe these equitable powers, it must do so with clarity: "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946) (emphasis added).

In order to ascertain whether Congress meant to constrain the equitable discretion afforded courts in SDWA cases, our examination begins -- and, for the most part, ends -- with the SDWA itself.  This is so because the discretion that inheres in a statutory injunction provision is, by definition, a product of the statute, and accordingly must be cabined by the purposes for which the statute was created.  United States v. Monsanto, 491 U.S. 600, 613 (1989).  Where, as here, the statutory injunction provision does not explicitly delimit the court's equitable authority, it is necessary to "look to the [statute's] remedial framework as a whole."  Williams v. Jones, 11 F.3d 247, 256 (1st Cir. 1993).  This task requires that courts not only consider the "language, history and structure"

of the legislation, TVA v. Hill, 437 U.S. 153, 174 (1978), but also the "underlying substantive policy" that the statutory procedures are designed to further, Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 544 (1987). Under this analysis, the language and structure of the Rule regarding the need for filtration reflect policy judgments made by the EPA, not Congress, and as such, are not relevant indicia of legislative intent. Cf. Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 & n.9 (1984) (directing courts to distinguish between agency policy and congressional intent and to reject administrative constructions that do not give effect to the intent of Congress).

The United States does not quibble with this analytical framework. Rather, it argues that the judicial-enforcement provision of the SDWA, 42 U.S.C. § 300g-3(b), when read along with the rest of the Act, admits of only one appropriate outcome in cases where a water system fails an avoidance criterion: the delinquent water system must be directed to install a filtration system. Accordingly, in the United States's view, the SDWA does create a "necessary and inescapable inference" that courts may not decline to order filtration whenever a violation of the Act or the rules promulgated thereunder has been established.

In reaching this conclusion, the United States focuses on the SDWA's judicial-enforcement provision, 42 U.S.C. § 300g-3(b), which states, in relevant part:

> The [EPA] Administrator may bring a civil action in the appropriate United States district court to require compliance with any applicable requirement [of the Act] . . . . The court may enter, in an action brought under this subsection, such judgment as protection of public health may require, taking into consideration the time necessary to comply and the availability of alternative water supplies . . . .

As the United States sees it, the key words in this passage are "compliance" and "comply." Based on their presence, as well as on the Act's command that the EPA delimit circumstances under which filtration is "required," id. § 300g-1(b)(7)(C)(i), the United States contends that, while § 300g-3(b) may not have abrogated courts' equitable powers to specify when ("the time necessary to comply") and how ("the availability of alternative water supplies") a violator is to comply with the filtration requirement, the provision does deprive courts of the authority to allow SDWA violators to remain in permanent noncompliance. In this respect, the United States contends that the case at bar is most akin to Hill, a decision in which the Supreme Court found that the district court did not have the equitable discretion under the Endangered Species Act to decline the issuance of an injunction if it found that a violation of

-31-

the statute's substantive provisions had occurred.  437 U.S. at 193-95.

To bolster this argument, the United States adverts to a passage from § 300g-3(b)'s legislative history that, it argues, evinces congressional intent to diminish courts' equitable discretion under the SDWA.  This passage, appearing in the report of the House Interstate and Foreign Commerce Committee (which authored the version of the Act that ultimately became law in 1974), states:

> [T]he Committee intends that courts which are considering remedies in enforcement actions under [§ 300g-3] are not to apply traditional balancing principles used by equity courts.  Rather, they are directed to give utmost weight to the Committee's paramount objective of providing maximum feasible protection of the public health at the times specified in the bill.

H.R. Rep. No. 93-1185 (1974), reprinted in 1974 U.S.C.C.A.N. 6454, 6476.

The Second Circuit has accepted this analysis, albeit in dicta, and concluded that, for largely the same reasons advanced by the United States, courts may not consider the propriety vel non of filtration in individual SDWA cases.  In United States v. City of New York, 198 F.3d 360 (2d Cir. 1999), a case in which a citizens' group sued to undo a consent agreement between New York City and the EPA that required the installation of a filtration system, the court in dicta stated:

> [T]he decision to filtrate or not is a
> policy choice that Congress seems to have
> made and that, in any event, is beyond our
> judicial function.  Our conclusion is not
> altered by appellants' interesting, but
> ultimately unpersuasive, argument that,
> since the SDWA authorizes a court to enter
> "such judgment as protection of public
> health may require," 42 U.S.C. § 300g-3(b),
> the district court has the power to refuse
> to order filtration in this action . . . .
> We think that the equitable power vested in
> the district court is more circumscribed
> than intervenors propose; it is available to
> ensure compliance with the statute and the
> regulations promulgated thereunder, not to
> rework or reject these legislative and
> regulatory determinations.

Id. at 366.[14]

While we agree that the SDWA's text and legislative history provide evidence of Congress's intent not to allow courts in SDWA cases to apply the traditional test for issuing injunctions,[15] we are not convinced that such evidence gives rise

_____

[14]This passage was dicta because the court disposed of the proposed intervenors' appeal on the alternative ground that the district court did not abuse its discretion by denying the organization's requests for intervention as a matter of right and for permissive intervention.  See id. at 367-68.

[15]In order to issue a permanent injunction, a district court typically must find that (1) the plaintiff has demonstrated actual success on the merits of its claims; (2) the plaintiff would be irreparably injured in the absence of injunctive relief; (3) the harm to the plaintiff from defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction; and (4) the public interest would not be adversely affected by an injunction.  E.g., A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997).  At least with respect to some statutory injunction provisions, however, courts have found that when Congress decides to make available the remedy of injunction for violations of a statute's substantive

-33-

to a "necessary and inescapable inference" that the substantive remedies made available under the Act must <u>always</u> be ordered whenever a regulation promulgated under the Act has been violated.[16] Rather, we believe that as long as a court issues a "judgment as public health may require," 42 U.S.C. § 300g-3(b), thereby ensuring that the public system provides water that is safe according to standards identified by the EPA, the court retains a measure of flexibility under the Act to tailor the specifics of an equitable remedy that will help bring about that goal. Our determination on this point is bolstered by several

provisions, irreparable injury is presumed to flow from such violations. <u>E.g.</u>, <u>United States</u> v. <u>City of Painesville</u>, 644 F.2d 1186, 1194 (6th Cir. 1981).

We note that, in spite of the legislative history indicating Congress's intent to narrow the scope of equitable discretion under the SDWA, at least one court has applied traditional principles of equitable balancing to determine the propriety of an injunction for violations of the Act's substantive provisions. <u>See</u> <u>United States</u> v. <u>Midway Heights County Water Dist.</u>, 695 F. Supp. 1072 (E.D. Cal. 1988) (denying public water system's motion for stay of preliminary injunction requiring it to comply with national drinking water regulations).

[16]We note that in <u>City of New York</u>, the proposed intervenors did not argue that the equities of the case favored withholding filtration in that particular case; rather, they sought to effect a "head-on challenge to filtration" <u>per</u> <u>se</u>. 198 F.3d at 366. The proposed intervenors' challenge principally was based on their assertion that "filtration . . . is [both] dangerous to consumers [and] fiscally wasteful." <u>Id.</u> at 363; <u>see</u> <u>also</u> <u>id.</u> at 364 ("[Appellants] do[] not seek to enforce administratively established criteria; [they] seek[] to block such enforcement."). Moreover, in <u>City of New York</u> (unlike in the present case) the public water system conceded that it would not be able to meet the avoidance criteria in the future. <u>Id.</u> at 362-63.

-34-

factors relating to the Act's "language, history and structure," Hill, 437 U.S. at 174, and its "underlying substantive policy," Village of Gambell, 480 U.S. at 544.

First, the critical passage of the SDWA's judicial-enforcement subsection states that, following a violation of the Act's substantive provisions, the court "may enter . . . such judgment as protection of public health may require . . . ." 42 U.S.C. § 300g-3(b) (emphasis added). When Congress uses the permissive "may" in settings such as § 300g-3(b), it is "eminently reasonable" to presume that the choice of verbiage is a deliberate one, and that, in the context of that statute, "'may' means may."[17] McCreary v. Offner, 172 F.3d 76, 83 (D.C. Cir. 1999); see also United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."); Flynn v. United States, 786 F.2d 586, 591 (3d Cir. 1986) (finding that where statute states that court "may" grant injunctive relief, the statute's use of the conditional "suggests that such relief is not mandatory in every case"). This tenet of statutory construction should obtain

---

[17]Conversely, when Congress employs the word "shall" in like contexts, it often means that "Congress has imposed a mandatory duty upon the subject of the command." Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999) (citing Monsanto, 491 U.S. at 607). However, even the use of the word "shall" does not necessarily eliminate all equitable discretion if Congress's purpose not to eliminate such discretion is manifest. Hecht Co., 321 U.S. at 329.

unless "obvious inferences from the structure and purpose of the statute [indicate] that 'may' was intended to have something other than its ordinary meaning." Reynolds v. Spears, 93 F.3d 428, 434-35 (8th Cir. 1996) (citing United States v. Rodgers, 461 U.S. at 706) (internal quotation marks omitted).

If anything, the strongest inference that may be drawn from the SDWA is that Congress did intend for "may" in § 300g-3(b) to track its everyday meaning. As mentioned in Part I, supra, Congress amended the Act in 1986 to enhance the level of enforcement under the SDWA. See 42 U.S.C. § 300g-3(a)(1)(B) (providing that if the responsible state enforcement authority does not commence enforcement action within thirty days of being notified by the EPA of existence of violation, "the Administrator shall issue an [administrative] order . . . or the Administrator shall commence a civil action . . . .") (emphases added); Rodgers, supra, § 4.20A, at 152 ("In making these changes Congress [was] convinced that it [could] control prosecutorial options by replacing 'mays' with 'shalls' in its enforcement instructions."). But in so amending the Act, Congress left untouched the "mays" contained in the Act's neighboring judicial-enforcement provision, thereby making only prosecution of substantive SDWA violations an expressly mandatory undertaking. It presumably did so with the understanding that under the Act, enforcement requires the

-36-

actions of two entities -- the state enforcement authority or the U.S. Attorney's office, who must sue to require compliance, and the district court, which must issue an injunction -- to bring about a substantive remedy under the Act. "[W]hen the same [provision] uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense -- the one act being permissive, the other mandatory." Anderson v. Yungkau, 329 U.S. 482, 485 (1947); see also Barbieri v. RAJ Acquisition Corp. (In re Barbieri), 199 F.3d 616, 619-20 (2d Cir. 1999) (distinguishing neighboring subsections of same section of Bankruptcy Code based on presence of "may" in one provision and "shall" in the other provision).

Additional evidence of the preservation of equitable discretion comes from the fact that, in the 1986 SDWA amendments, Congress vested power in the EPA to issue administrative orders for minor SDWA violations, and to collect fines for those violations, without first seeking authorization from the courts. See 42 U.S.C. § 300g-3(g). In the report of the Senate Environment and Public Works Committee (which generated the version of the bill that ultimately became law) on the enactment of these amendments, the Committee stated that "[t]he purpose of adding administrative order authority is not to replace judicial enforcement, but to add a complementary enforcement mechanism." S. Rep. No. 99-56, at 9 (1986),

<u>reprinted</u> <u>in</u> 1986 U.S.C.C.A.N. 1566, 1574.  By affording the EPA an intermediate remedy for SDWA violations that does not require court action, Congress explicitly contemplated a system in which substantive violations of the Act (particularly minor ones) would not always result in the issuance of an injunction. See <u>Romero-Barcelo</u>, 456 U.S. at 317-18.

In sum, there is substantial evidence in the SDWA's text and legislative history to suggest that "may" really does mean "may" in § 300g-3(b).  While these clues alone might not suffice to eliminate all doubt that Congress intended for "may" to have a permissive meaning, at a minimum, they do eliminate the possibility that the SDWA's structure and purpose generate an "obvious inference" that the word "may" in § 300g-3(b) really means "shall."[18]  <u>Rodgers</u>, 461 U.S. at 706; <u>see</u> <u>also</u> Russ Winner, <u>The Chancellor's Foot and Environmental Law: A Call for Better Reasoned Decisions on Environmental Injunctions</u>, 9 Envtl. L.

---

[18]The United States asserts that by creating a filtration exemption under the SDWA in 1996 for water systems with uninhabited and undeveloped watersheds in consolidated control, 42 U.S.C. § 300g-1(b)(7)(C)(v), Congress demonstrated its belief that such an amendment was needed to circumvent the mandatory command of the Act's filtration requirement. We disagree. This provision merely authorizes state enforcement agencies, who would otherwise be obliged to bring an enforcement action for avoidance-criteria violations, <u>see</u> <u>id.</u> § 300g-3(a)(1)(B) (requiring the EPA to bring suit for substantive SDWA violation if state enforcement agency fails timely to do so), to permit compliance with the Act by means other than filtration for certain types of water systems.  The amendment does not touch upon the power of the court to issue -- or not issue -- an injunction.

477, 506 (1979) ("If . . . the legislation explicitly requires that 'an injunction must issue,' a court . . . has no choice but to comply. Most of the time, however, the legislature is silent as to injunctive remedy or merely says that an injunction 'may' issue. In this case, courts usually retain their full equitable discretion.").

Our conclusion on the SDWA's preservation of equitable discretion also is reinforced by other portions of the Act's judicial-enforcement provision. While the United States relies heavily on language in § 300g-3(b) referring to compliance with the Act, and specifically on statements to the effect that the EPA Administrator is authorized to "bring a civil action . . . to require compliance" and that a court hearing an SDWA suit "may enter . . . such judgment as protection of public health may require, taking into consideration the time necessary to comply," we find that such language, when compared to similar language in other federal enforcement statutes, does not compel the conclusion that the court must issue an injunction.

Take, for example, the provision empowering the EPA to bring a civil action "to require compliance." Similar language appears in a number of other statutes' judicial-enforcement provisions, and generally has been construed as leaving intact the judiciary's equitable discretion to deny the issuance of an injunction. The courts reaching this interpretation have

reasoned that the language simply represents Congress's grant of authority to an agency to bring a suit to require compliance -- in other words, that the agency can <u>seek</u> to require compliance through legal process.

For instance, under the judicial-enforcement provision of the Securities and Exchange Act of 1934, 15 U.S.C. § 78u(d)(1), the SEC "may, in its discretion, bring an action . . . to enjoin . . . acts or practices" violating the statute's substantive provisions. In <u>SEC</u> v. <u>Frank</u>, 388 F.2d 486, 491 (2d Cir. 1968), Judge Friendly, writing for the panel, found such language not susceptible of the interpretation that equitable discretion had been stripped from the district court: "Such bland language affords no sufficient basis for concluding that Congress meant special weight to be given the Commission's decision to allow its staff to institute suit. If Congress wishes to go further, it should say so in language all can understand." Likewise, in <u>Federal Power Commission</u> v. <u>Arizona Edison Co.</u>, 194 F.2d 679, 684-86 (9th Cir. 1952), the Ninth Circuit, reaching an analogous conclusion with respect to identical language in the judicial-enforcement provision of the Federal Power Commission Act, 16 U.S.C. § 825m(a), held that the courts' traditional powers of equity had not been eviscerated by the agency's power to bring suit to require compliance. Another example of this usage, albeit in a slightly different context,

appears in the citizen-suit provision of the Clean Water Act; under this statute, suits may not be instituted by individuals or organizations if the EPA or the appropriate state enforcement authority "has commenced and is diligently pursuing a civil or criminal action . . . to require compliance" with the Act's substantive provisions. 33 U.S.C. § 1365(b)(1)(B) (emphasis added). Despite this reference to "requir[ing] compliance" in the statutory language, the Supreme Court held in Romero-Barcelo that the Clean Water Act does not require the issuance of an injunction in all cases where a statutory violation has been identified. 456 U.S. at 313 (holding that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests a duty to do so under any and all circumstances"). These examples demonstrate that a statutory provision that gives an agency the power to litigate "to require compliance," without more, does not necessarily obligate the court asked to rule on such a suit to issue any particular remedy.[19]

The other passage in § 300g-3(b) referred to by the United States -- the one stating that courts are to consider "the time necessary to comply and the availability of alternative water supplies" in fashioning equitable relief -- is better construed to mean that, to the extent a court issues a

_____

[19]As we note infra, we believe that the district court did require compliance with the SDWA in this case.

-41-

"judgment as public health may require" that <u>does</u> include the filtration remedy (which, as the district court noted, will usually be the case), it must allow the public water system reasonable time to comply in light of the availability of alternative water sources.  From the command that a court must consider the time necessary to comply when it does order a "judgment as public health may require," however, it does not necessarily follow that the court must <u>always</u> exact the type of compliance sought by the agency whenever a violation of the Act has been identified.  This construction is supported by the fact that, in spite of the ubiquitousness of the term "compliance" in § 300g-3(b), courts are not expressly limited by the statute to entering judgments that "require compliance," but instead have been granted the leeway to issue "judgment[s] as protection of public health may require."  <u>Cf.</u> <u>Natural Res. Def. Council</u> v. <u>Southwest Marine, Inc.</u>, 236 F.3d 985, 1000 (9th Cir. 2000) (holding that, with respect to judicial-enforcement provision in Clean Water Act limiting courts to "enforce[ment]" of existing standards and orders, "the authority to 'enforce' an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed"), <u>cert. denied</u>, 121 S. Ct. 2242 (2001).

In sum, while the United States's position certainly is not implausible, the fact that the MWRA's interpretation of

the SDWA is at least as plausible effectively forecloses the possibility that a "necessary and inescapable inference" exists in the Act as to the necessity for filtration upon a finding of a regulatory violation.  Porter, 328 U.S. at 398.

The United States insists that, in terms of breadth of equitable discretion, the SDWA bears an uncanny resemblance to the Endangered Species Act (ESA) -- a statute found by the Supreme Court to have removed courts' authority to withhold injunctive relief.  Hill, 437 U.S. at 193-95.  In Hill, the Supreme Court found that the ESA had flatly banned federal agencies from carrying out activities which threaten to destroy or modify the habitat of endangered species.  Id. at 194. Through an examination of the statute's voluminous text and legislative history, the Court found that Congress "ha[d] spoken in the plainest of words, making it abundantly clear that the balance had been struck in favor of affording endangered species the highest of priorities . . . ."  Id.  In so finding, moreover, the Court essentially ignored the statute's judicial-enforcement provision, 16 U.S.C. § 1540(g), which, far from expressly requiring the issuance of an injunction upon the finding of a statutory violation, merely gives district courts "jurisdiction . . . to enforce any . . . provision" of the Act.[20]

_____

[20]This apparent omission was noted in a dissent by then-Justice Rehnquist, who, after taking note of the provision, determined that it was not strong enough to eliminate the

-43-

Attempting to tether this case to that precedent, the United States flags what it sees as analogous indicia of legislative intent with respect to the filtration mandate in the SDWA, and urges us to overlook the similarly permissive nature of the SDWA's judicial-enforcement provision.

While there is force to this argument, in the final analysis we do not believe that it holds water. The principal problem with the United States's effort to juxtapose the ESA and the SDWA is that, for reasons discussed above, the overwhelming evidence of congressional intent that the Supreme Court found in Hill simply does not exist with respect to the filtration mandate in the SDWA. The United States points us to no specific evidence that the narrow goal of filtration (as opposed to the broader aim of safe drinking water) was to receive the overarching priority that endangered-species protection garnered under the ESA. As the district court noted, by imposing the disinfection mandate directly even as it imposed the filtration remedy indirectly, Congress "stopped short of ordering filtration as an all-encompassing preventive." MWRA II, 97 F. Supp. 2d at 165. As for the Supreme Court's failure to consider the language of the ESA's judicial-enforcement provision in Hill, we note that in subsequent cases, such as United States v.

_____

presumption of retained equitable discretion. Hill, 437 U.S. at 211-13 (Rehnquist, J., dissenting).

Oakland Cannabis Buyers' Cooperative, the Court has found that piece of legislative evidence to be particularly relevant in ascertaining the extent to which equitable discretion had been retained. See ___ U.S. ___, 121 S. Ct. 1711, 1721 (2001) (analyzing judicial-enforcement provision of Controlled Substances Act, 21 U.S.C. § 882(a), and concluding that the district court "is not textually required by any clear and valid legislative command" in that provision to issue an injunction) (internal quotation marks omitted). Whether or not the approach taken in Hill with respect to the ESA is still "good law," we are not persuaded that a similar approach is appropriate here.

Apart from its arguments concerning the text of the SDWA, the United States also pursues a broader line of attack in this appeal: that the district court's decision excuses an ongoing statutory violation, and therefore exceeds the scope of equitable discretion that may be exercised under any statute. While acknowledging the Supreme Court's statement that "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law," Romero-Barcelo, 456 U.S. at 313, the United States contends that the Court has never authorized courts to do what it claims the district court did in this case -- namely, to permit a water system in violation of the SDWA to remain in violation indefinitely. In pressing this argument, the United States

-45-

points to three of the Court's seminal cases in this area from the last century: Hecht Co., Romero-Barcelo, and Village of Gambell. Even though the Supreme Court endorsed the district court's exercise of equitable discretion in each of those decisions, the United States correctly observes that the district court's order in all three cases was designed to lead to compliance with the relevant statute.[21]  By declining to order the MWRA to install a filtration system, the United States contends, the district court was unfaithful to these precedents by "allow[ing] the MWRA to remain out of compliance with the SDWA and the SWTR permanently."

We agree that in all three of these cases -- and, indeed, in all cases in which the Supreme Court has spoken in this area -- the violating party was not permitted to evade the substantive requirements of the statute.  We disagree, however,

_____

[21]In Hecht Co., the defendant had remedied its past violations of the Emergency Price Control Act, and the district court had found that those transgressions were not likely to recur.  321 U.S. at 325-26.  In Romero-Barcelo, the Court noted that the violator (the Navy) was likely in the near future to receive the permit it needed to comply with the Federal Water Pollution Control Act amendments to the Clean Water Act, and found that the statute's judicial-enforcement provision "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act."  456 U.S. at 320 (emphasis added).  And in Village of Gambell, the Court found that because oil companies needed to receive further approval from the Secretary of the Interior before engaging in drilling off the coast of Alaska, the district court was not required, under the Alaska National Interest Lands Conservation Act, to enjoin the companies' activities based on their past failures to meet the Act's procedural requirements.  480 U.S. at 544.

-46-

with the United States's argument that the court is permitting noncompliance in this case. "[W]hen a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of employing the extraordinary remedy of injunction over the other available methods of enforcement." Oakland Cannabis Buyers' Coop., 121 S. Ct. at 1722 (internal citations and quotation marks omitted). Because the court's order is designed to ensure that the Act's paramount objective of safe drinking water remains fulfilled in the future, the district court did not, as the United States argues, sanction perpetual noncompliance with the Act. See Village of Gambell, 480 U.S. at 544 (directing courts charged with ensuring compliance with a statute to focus on "the underlying substantive policy the process was designed to effect"). Contrary to the situation in Hill, this is not a case where "Congress' order of priorities, as expressed in the statute, would be deprived of effect if the District Court could choose to deny injunctive relief." Oakland Cannabis Buyers' Coop., 121 S. Ct. at 1721 (internal quotation marks omitted) (citing Hill, 437 U.S. at 194).

Although the EPA is correct that filtration is an absolute requirement under the SDWA/SWTR regime for those water systems that fail to meet the avoidance criteria, the

preeminence of filtration in bringing about the goal of safe drinking water is primarily a function of the Rule, not the Act. The purpose of the Act, in the words of its drafters, is to "assure that water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. No. 93-1185, reprinted in 1974 U.S.C.C.A.N. 6454, 6454. In other words, the framers of the Act were concerned with ensuring that consumers of public water systems have access to safe drinking water, with the safety of the water to be judged according to objective criteria developed by the EPA. Filtration, while serving an important role in furtherance of the objective of safe water, is merely a prophylactic remedy made available to help bring about that objective. One fact underscores this point particularly well, and demonstrates why the exercise of equitable discretion is especially appropriate with respect to this particular regulatory scheme: under the Act, if a water system never violates any of the avoidance criteria, its water is presumptively "safe" according to the SDWA, regardless of whether it ever installs a filtration system. In essence, the water system's compliance with the avoidance criteria makes the water safe from the EPA's perspective -- a point conceded by the United States at trial. We fail to see how accomplishment of the Act's substantive goals is undermined by overlooking past violations of regulatory

deadlines that have no bearing on the current or future purity of the water delivered to consumers. See Romero-Barcelo, 456 U.S. at 310 (noting that purpose of injunctive relief is to deter future violations, not to punish past ones) (citing Hecht Co., 321 U.S. at 329-30); cf. Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 192 (2000) (holding that district court had discretion under Clean Water Act "to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones") (emphasis added). Moreover, given that the district court has retained jurisdiction in this case for the purpose of policing any future violation, thereby allowing it to revisit the validity of its earlier decision not to order filtration, the United States has a ready forum in which to seek relief for any future avoidance-criteria violations. See Romero-Barcelo, 456 U.S. at 320 ("Should it become clear that . . . compliance with the [statute] will not be forthcoming, the statutory scheme and purpose would require the court to reconsider the balance it has struck.").

Besides the issue of ongoing supervision to ensure compliance, the case at bar bears a close similarity to Romero-Barcelo in at least one other respect: the district court's focus on the relevant statute's substantive purposes, rather than its technical requirements. In Romero-Barcelo, the

plaintiffs claimed that, by allowing the Navy to continue bombing exercises on Vieques Island without first having obtained a discharge permit, the court was countenancing an ongoing statutory violation -- namely, the unpermitted discharge of ordnance into navigable waters. 456 U.S. at 314. Disagreeing with this characterization, the Supreme Court found that, by tying future Navy activities to its procurement of a discharge permit, the district court had "neither ignored the statutory violation nor undercut the purpose and function of the permit system." Id. at 315. This was the case, according to the Court, because "[t]he integrity of the Nation's waters, . . . not the permit process, is the purpose of the [statute]." Id. at 314. So it is here: the manifest purpose of the SDWA is safe drinking water, not filtration.

Of course, we are aware that the filtration mandate is, in some meaningful way, more "substantive" than the FWPCA's permit requirement, and that, through the 1986 amendments to the SDWA, Congress expressed its intent that filtration should be used by water systems that fail to meet the standards for avoidance established by the EPA. But in the end, we believe that we would do far greater violence to both the text and the purpose of the SDWA were we to strip courts of the flexibility to shape equitable decrees in appropriate situations. For as we noted infra, under § 300g-3(b), courts are authorized to issue

-50-

"judgments as protection of public health may require." Moreover, by retaining jurisdiction in this case, the district court has assumed the responsibility of ensuring that, through continued oversight of the MWRA's avoidance-criteria compliance, the MWRA's water supply will remain "safe" according to the EPA's standards.

The United States's final contention -- in reality, it is nothing more than a variation on the basic theme of its appeal -- is that the district court, by holding a trial on the propriety of applying the filtration requirement to the MWRA, arrogated to itself powers that had been placed by Congress in the hands of the EPA. In its view, the district court's trial amounted to little more than an improper reconsideration of the determinations that the EPA made in promulgating the Rule. Under the SDWA, the United States argues, such considerations are the exclusive province of experts in the EPA, not the courts, and if the district court's decision is left to stand, every water system that finds itself displeased with the SWTR's rigid requirements will have the opportunity to challenge the wisdom of the Rule as applied to it.

This line of reasoning only is valid as far as it goes -- and it does not go as far as the United States suggests. It is certainly true that, in delegating authority to the EPA to ascertain circumstances in which "filtration . . . is required"

of public water systems, 42 U.S.C. § 300g-1(b)(7)(C)(i), Congress entrusted the EPA with the power to make policy judgments with respect to the factors that would make filtration mandatory. It is also true that, as a general matter, those judgments are not to be second-guessed by courts. But policy determinations in statutes and regulations that Congress chooses to have enforced through suits in equity are always subject to courts' equitable discretion -- that is, at least to the extent that Congress has preserved discretion in the statute and has not proscribed, through its expressions of policy, the type of equitable remedy that a court seeks to implement. If Congress has left the door open to a court to exercise equitable discretion respecting enforcement of a statute such as the SDWA, and the court senses that the equities of the case may favor alternative means of exacting compliance with the statute (i.e., other than the issuance of an injunction), the court does not exceed the boundaries of its authority by conducting fact-finding for the purpose of determining how best to wield its discretion in light of the priorities established in the statute. The district court did not hold a trial to revisit the underlying wisdom of the SWTR; rather, it held a trial to ascertain whether, based on both the particular facts of this case and the substantive goals of the Act, it was more appropriate to order filtration or to permit the MWRA to pursue

its alternative approach to the extent that it could satisfy the Rule's avoidance criteria and ultimately provide a safer water supply.

In sum, with respect to the SDWA, a court must "take as given the value choices embodied in the statutes and policies administered by the [agency], but is entitled and in fact required to consider whether the enforcement of the [agency's] order would violate equitable principles that are neutral with regard to those value choices."  NLRB v. P*I*E Nationwide, Inc., 894 F.2d 887, 893 (7th Cir. 1990).  In our view, this is precisely what the district court did in this case.

## Conclusion

Under the SDWA, it should be a rare case in which a violation of regulatory standards does not lead to an injunction if the responsible enforcement agency requests one.  This is so because, as the district court in this case properly found, the SDWA contains a "presumption expressed by Congress . . . that filtration will almost always be the preferred remedy for a[n] SWTR violation."  MWRA I, 48 F. Supp. 2d at 72.  Expressions by Congress of this sort, once identified, must be respected by courts, lest equitable discretion become the judiciary's preferred method of reshaping policy determinations made by other branches of government that are better equipped to make them.  But the district court, after carefully considering the

-53-

facts, found that this was indeed such a rare case, and accordingly declined to issue an injunction. In rendering this judgment, the court was careful to shape its decision so as to ensure that the MWRA's drinking water will meet the avoidance-criteria standards that are the EPA's benchmarks for safety. It exercised the flexibility left to it by Congress in the statute, and assumed the responsibility of monitoring the MWRA's compliance in the event that future violations require a reexamination of the decision not to order filtration. In short, the district court used its equitable discretion to appropriate ends: furthering the substantive purposes of the Act. In so doing, it did not act outside the scope of its authority with respect to the specific statute at issue in declining to issue an injunction. Accordingly, the district court's judgment is

**Affirmed.** No costs.